# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

DEQUANDRE HUNT,

        Petitioner,

v.                                            Case Number: 2:12-CV-13105

KEN TRIBLEY,

        Respondent.
_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY

Petitioner Dequandre Hunt has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his convictions for first-degree home invasion, Mich. Comp. Laws § 750.110a(2) and possession of less than 25 grams of cocaine, Mich. Comp. Laws § 333.7403(2)(a)(v). (Dkt. # 1.) Petitioner, who is presently incarcerated at the Alger Correctional Facility in Munising, Michigan, seeks habeas relief on the grounds that insufficient evidence supported his first-degree home invasion conviction, he received ineffective assistance of counsel, and certain offense variables were incorrectly scored. Respondent has filed a response arguing that the claims are meritless and that the sentencing-related claim is untimely. (Dkt. # 16.) For the reasons set forth, the court denies the petition.

## I. BACKGROUND AND PROCEDURAL HISTORY

Petitioner was charged in Genesee County Circuit Court with first-degree home invasion, assault with intent to commit armed robbery, assault with a dangerous weapon, felony firearm, felon in possession of a firearm, carrying a concealed weapon,

and possession of cocaine. Following a jury trial, he was convicted of first-degree home invasion and possession of cocaine, and acquitted of the remaining charges. The Michigan Court of Appeals provided a detailed summary of the testimony adduced at trial:

> This case stems from a missing blue bicycle. The crux of the case involves the testimony of the complainants, Joshua Samuel and Amy Ogg, as well as a 12-year-old witness, Jakavious Darquell Hamilton, that defendant came to Samuel and Ogg's apartment door armed with a handgun demanding the return of defendant's cousin's bicycle.
>
> Ogg testified that she and Samuel reside together in an apartment in Burton, Michigan. Ogg testified that on July 16, 2009, around 7:00 pm she was watching television with her young son when Samuel ran into the apartment yelling that she should call 911. She got up to see what was going on and saw defendant standing in her apartment pointing a gun in Samuel's face. She safeguarded her son, retrieved her telephone and then called 911. When defendant saw her calling the police he put the gun away and started to leave the apartment. Ogg told 911 that there was "a black man with a gun" in her apartment. Ogg stated that defendant asked Samuel about defendant's cousin's bicycle. Defendant accused Samuel of stealing the bicycle with a loud voice. After defendant left, she locked the apartment door and waited for the police. When the police arrived she gave the police her statement. Shortly thereafter police asked Ogg to identify defendant. She stated that she went with police to their car and he was sitting in the car. Ogg identified defendant as the person who came into her apartment with a gun. Ogg testified that Samuel worked on bikes regularly and that there were bikes piled up on the corner of the apartment. When he works on bikes he lays out a tarp in the middle of the living room. At the time defendant came to the apartment, defendant was only working on Ogg's bicycle. But there were at least six bikes in the apartment at the time defendant came into the apartment. According to Ogg, Samuel fixes bikes for the children in the neighborhood for free.
>
> Samuel testified that he is not currently employed but does maintenance work at the apartment complex for a percentage off his rent. Samuel's hobby is to ride and work on bicycles. He stated that he fixes bikes for the children in the apartment complex because they do not have the money to do it themselves. Samuel testified that on July 16, 2009, he spent the day working on his own bike first and then on Ogg's bike in the living room of their apartment. Some of the kids in the complex came by the apartment that day while he was working on the bikes. The kids (age range 6 to 11

2

years old) regularly stop by and hang out with Samuel while he works on bikes and they sometimes all go on bike rides. According to Samuel, at about 7:00-7:15 pm, he heard a knock at the door so he went and answered it. Some of the kids were still at his apartment at this time.

Samuel testified that he did not know the person at the door, defendant. Samuel stated that defendant asked if he could speak with Samuel for a minute and Samuel agreed. Samuel testified that he had just finished working on Ogg's bike at that time and was about to take the kids for a bike ride. So he came back inside, grabbed his bike, stepped just outside the apartment door to speak with defendant, and then closed the apartment door. The children also left the apartment and were standing on the sidewalk. Samuel stated that defendant said, "so I heard you have my cousin's bike." According to Samuel at first he said he did not know if he had the bike because he did not know defendant and did not know who his cousin was and he could have had the bike if it was one that a child had dropped off to be fixed. Samuel asked defendant the missing bike's color. Defendant said his cousin's bike was blue. Samuel said that he only had two bikes in the house that were blue and one was Ogg's bike and the other one was his own mountain bike. Samuel said he did not have the bicycle and defendant insisted that someone had told him that Samuel had the bicycle and that he was working on it and that he wanted the bike. Samuel testified that at one point he opened the door to his apartment and showed defendant, stating "I don't have your cousin's bike ... these are the bikes that I have."

According to Samuel defendant started to get upset when he said he did not have the bike. Defendant demanded the bike and lifted his shirt up exposing his waist band area to show Samuel the handle of a chrome gun. Samuel stated that he told the kids to get out of the area and then he opened his apartment door, pulled his bike back in, and then closed the door. Samuel stated that as he was trying to lock the door, defendant pushed the door back open and walked inside the apartment with the gun pointed in Samuel's face. Samuel described the gun as "a little western type six shooter." Samuel stated that he did not give permission for defendant to enter the apartment. According to Samuel, as defendant pointed the gun at him, defendant said "I want my cousin's bike now." Samuel testified that defendant did not say anything else and they did not have a conversation inside the apartment. Samuel stated that he had no idea what bike defendant was talking about and yelled multiple times for Ogg to call the police. According to Samuel, when defendant realized Ogg was calling the police, defendant left the apartment in a hurry. Samuel testified that the police showed up at the apartment quickly and he explained to them what happened and then he identified defendant as the person who came into his apartment when police asked him if he

3

recognized the person sitting in their police vehicle. Samuel's memory was hazy on whether he knew that a bike was missing before defendant came to his door. Samuel testified that he thought one of the kids might have asked him if he "had seen a bike," but Samuel did not remember.

On cross-examination Samuel admitted that he heard Ogg tell 911 that "this is about a bicycle gotten out of the dumpster a couple days ago." Samuel also admitted that he had corrected Ogg while she was on the phone saying, "that was a couple weeks ago." Samuel testified that he remembered about two weeks before the incident that one of the kids had brought him a bike out of the dumpster and Samuel told the kid that he did not want it. Samuel testified that defendant never pointed out a specific bike out of the ones in the apartment and never said anything similar to: "give me that bike," "I'm taking this," or "hand over your wallet or anything else."

Jakavious Darquell Hamilton is twelve years old and stays at the complex sometimes because his grandmother lives there. Hamilton testified that he hangs out with Samuel and they ride bikes. Hamilton stated that Samuel lends him a bike to ride and that Samuel has different bikes. Hamilton testified that at the time of the incident he and some other kids were hanging outside Samuel's apartment waiting to go for a bike ride. Hamilton stated that he saw defendant and a twelve-year-old boy walking up to Samuel's apartment door. Hamilton testified that he told the police later that he had heard defendant and the twelve-year-old boy talking about a stolen bike. Hamilton stated that defendant and the twelve-year-old boy walked up to Samuel's apartment and that Samuel had the door open and at one point Samuel allowed defendant and the boy to walk inside his apartment and look for the bike. Hamilton testified that defendant had a gun out as he was walking up to the apartment but also testified that defendant pulled the gun on Samuel during their conversation outside the apartment. Though, he testified that he had no doubt that he saw defendant point a gun at Samuel. Hamilton testified that the boy stayed with defendant throughout the entire incident. According to Hamilton, Samuel told defendant and the boy that he found the bike they were claiming was theirs by the dumpster. Hamilton also testified that it was the maintenance man that threw the bike away.

Officer Jeremy Driggett testified that he responded to a call of an armed robbery at the Kings Lane Apartments on the date of the incident. Driggett testified that he was checking the complex and located defendant at building three. Driggett believed defendant matched the description given of the suspect. Driggett asked him to come to his location. Defendant stated that he needed to talk to his cousin and he walked into an apartment and closed the door. As Driggett walked to the back of the

4

apartments, his partner yelled that defendant was walking out of the apartment and approaching police. Defendant was in the apartment, at most, one minute. Driggett placed defendant in handcuffs and then frisked him. Driggett found a plastic baggie containing crack cocaine in the left pocket of defendant's shorts. Police did not find a gun on defendant and placed him under arrest on suspected drug charges.

Driggett stated that he brought Samuel and Ogg separately to look into the back of the patrol car to identify defendant as the suspect. Driggett testified that Samuel was "very emotional, very upset, nervous, scared." He also spoke with Hamilton to get his statement. Driggett testified that after defendant was transported to jail and booked, Driggett notified defendant of the charges he was facing including armed robbery, home invasion, and possession of cocaine. According to Driggett, immediately after hearing the charges defendant got upset and started talking. Defendant said that he knew Samuel and that he had accused Samuel of stealing his cousin's bike and that he was going to go over to Samuel's apartment and fight him. He also said that he left Samuel's apartment because they accused him of having a gun when he did not and they said they were going to call the police. According to Driggett, defendant admitted to going to Samuel's apartment to confront him about a bike.

At trial, in lieu of further prosecution witnesses, the parties stipulated that the substance seized from defendant was cocaine.

Deondre Keel-Haywood is defendant's cousin and is twelve-years old and was the only defense witness at trial. He testified at trial that at the time of the incident he lived at Kings Lane Apartments. Keel-Haywood testified that he had a light blue bicycle that he kept outside under the porch at the apartment complex. He stated that he stayed at a cousin's house one night and when he came back the bike was gone. Keel-Haywood testified that he came to know that his bike might be at Samuel's apartment. He stated that he went to talk to Samuel by himself the first time. Then he returned with his cousin, defendant, later that day. According to Keel-Haywood, they went to Samuel's apartment together and spoke with Samuel outside the apartment. Defendant asked Samuel if he had seen a blue bike, then Samuel responded, "yes, I think it came out of the dumpster." Then defendant asked if they could see the bike and Samuel said "yes" and then pushed open the door of his apartment. Keel-Haywood said he looked inside and saw a blue tarp (like one that would "go on top of the car") on the floor of the apartment and his bike was in pieces on the tarp. He testified that he recognized the "seat the handle bars, my tires, and the frame." According to Keel-Haywood, at that point defendant asked Samuel "why did he take my bike and take it all into pieces. And then [Samuel] said, don't be questioning me." Keel-Haywood

5

stated that he said they should just leave because he did not want the bike anymore and Samuel could just have it. Keel-Haywood testified that defendant did not have a gun while they were talking to Samuel and that defendant did not have a gun and did not like guns. He also testified that neither he nor defendant went into Samuel's apartment. He said that they just stood outside the door. He did not remember whether anyone said to call the police. Keel-Haywood stated that later that night his mother went to Samuel's apartment and asked about the bike and Samuel said that he was going to give Keel-Haywood a bike, but that they never went to get it.

*People v. Hunt,* No. 295967, 2011 WL 923547, *1-5 (Mich. Ct. App. March 17, 2011).

On November 9, 2009, Petitioner was sentenced to 6-1/2 to 30 years' imprisonment for the first-degree home invasion conviction and 2 to 6 years' imprisonment for the cocaine possession conviction. Petitioner filed an appeal of right in the Michigan Court of Appeals raising five claims for relief. The Michigan Court of Appeals affirmed Petitioner's convictions. *Id.* The Michigan Supreme Court denied Petitioner leave to appeal. *People v. Hunt*, 489 Mich. 993 (Mich. July 25, 2011).

Petitioner then filed this habeas petition, raising these claims:

I. Mr. Hunt's conviction for first-degree home invasion should be reversed where there was insufficient evidence of larcenous intent.

II. Mr. Hunt was denied his state and federal constitutional right to the effective assistance of counsel where defense counsel requested a claim of right instruction but failed to object when the prosecutor maintained that it was only relevant to the assault with intent to commit robbery.

III. Mr. Hunt was denied his state and federal constitutional right to the effective assistance of counsel when counsel failed to inquire further into the potential bias of a juror.

IV. Mr. Hunt was denied his constitutional right to be sentenced on the basis of accurate information due to the misscoring of OV-1, OV-2, OV-4, and OV-13.

## II. STANDARD

28 U.S.C. § 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

"A state court's decision is 'contrary to' ... clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (per curiam), *quoting Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). "[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003), *quoting Williams*, 529 U.S. at 413. However, "[i]n order for a federal court find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted);

7

*see also Williams*, 529 U.S. at 409. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011), *quoting Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.... As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87 (internal quotation omitted).

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *See Williams*, 529 U.S. at 412. Section 2254(d) "does not require citation of [Supreme Court] cases – indeed, it does not even require awareness of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). "[W]hile the principles of "clearly established law" are to be determined solely by resort to Supreme Court rulings, the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007), *citing Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir.2003).

Lastly, a federal habeas court must presume the correctness of state court

8

factual determinations. See 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption only with clear and convincing evidence. *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

### III. DISCUSSION

#### A. Sufficiency of the Evidence

Petitioner's first claim for habeas corpus relief concerns the sufficiency of the evidence to support the first-degree home invasion conviction. Under Michigan law, first-degree home invasion consists of three elements: (1) breaking and entering a dwelling or entering a dwelling without permission; (2) intending when entering to commit a felony, larceny, or assault in the dwelling, or at any time while entering, present in, or exiting the dwelling commits a felony, larceny, or assault; and (3) while entering, present in, or exiting the dwelling, the defendant is either armed with a dangerous weapon, or another person is lawfully present in the dwelling. *People v. Wilder*, 485 Mich. 35, 43 (2010). Petitioner argues that the prosecutor presented insufficient evidence to establish his intent to commit a larceny.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). On direct review, review of a sufficiency of the evidence challenge must focus on whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). In the habeas context, "[t]he *Jackson* standard must be applied 'with explicit reference to the substantive elements of

the criminal offense as defined by state law.'" *Brown v. Palmer*, 441 F.3d 347, 351 (6th Cir. 2006) (quoting *Jackson*, 443 U.S. at 324 n.16)).

"Two layers of deference apply to habeas claims challenging evidentiary sufficiency." *McGuire v. Ohio*, 619 F.3d 623, 631 (6th Cir. 2010) (citing *Brown v. Konteh*, 567 F.3d 191, 204-05 (6th Cir. 2009)). First, the Court "must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Brown*, 567 F.3d at 205, (citing *Jackson,* 443 U.S. at 319). Second, if the Court were "to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, [the Court] must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *Id.* Indeed, the Jackson standard is "exceedingly general" and therefore Michigan courts are afforded "considerable leeway" in its application. *Davis v. Lafler*, 658 F.3d 525, 535 (6th Cir. 2011).

The Michigan Court of Appeals first held that Petitioner was mistaken in arguing that the prosecution failed to prove his larcenous intent because Petitioner was charged with first-degree home invasion with the predicate felony as assault, not larceny. *Hunt*, 2011 WL 923547 at \*5. The state court noted that the trial court initially (and incorrectly) instructed the jury on first-degree home invasion with the predicate felony as larceny, but, after a brief bench conference, the trial court corrected itself and reinstructed the jury on the elements of first-degree home invasion with the predicate felony of assault. *Id.* The state court found sufficient evidence to sustain the first-degree home invasion conviction:

> Because of the difficulty in proving a defendant's state of mind, minimal circumstantial evidence is sufficient to establish the defendant's intent. *People v. Kanaan*, 278 Mich.App. 594, 622, 751 N.W.2d 57 (2008). A defendant's intent may be proved by the nature, time, and place of the defendant's acts before and during the breaking and entering. *People v. Uhl*, 169 Mich.App. 217, 220, 425 N.W.2d 519 (1988). Here, when viewing the evidence in the light most favorable to the prosecutor, the evidence shows that defendant was upset about his cousin's missing bicycle and went to retrieve it from Samuel. Samuel, Ogg, and Hamilton all testified that defendant pushed himself into Samuel's apartment and pointed a gun at Samuel's face demanding information about the missing bicycle. Samuel yelled to Ogg that defendant had a gun and she needed to call 911. Driggett testified that Samuel was "very emotional, very upset, nervous, scared," when he interviewed him a short time after the incident. Viewing this evidence in the light most favorable to the prosecution, a rational trier of fact could find beyond a reasonable doubt that defendant intended to commit an assault. Defendant's conviction of first-degree home invasion is supported by sufficient evidence.

*Id.*

The sufficiency-of-the-evidence determination in this case clearly turns on credibility determinations. "A reviewing court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court." *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003), (citing *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)). "A reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *McDaniel v. Brown*, 558 U.S. 120, 133 (2010), (quoting *Jackson*, 443 U.S. at 326). If the jury found the testimony of Samuel, Ogg, and Hamilton credible, each element of first-degree home invasion was proven beyond a reasonable doubt. Thus, the decision of the Michigan Court of Appeals passes scrutiny under the deferential AEDPA standard. The state

appellate court applied the correct constitutional test, relied on facts supported in the record, and did not unreasonably apply clearly established constitutional law. Habeas relief is denied on this claim.

### B. Ineffective Assistance of Counsel Claims

In his second and third habeas claims, Petitioner argues that he received ineffective assistance of counsel. He argues that counsel was ineffective in failing to request a claim of right instruction with respect to the first-degree home invasion charge and failing to inquire into the potential bias of a juror.

The standard for obtaining habeas corpus relief is "'difficult to meet.'" *White v. Woodall*, 134 S.Ct. 1697, 1702 (2014), *quoting Metrish v. Lancaster*, 133 S.Ct. 1781, 1786 (2013). In the context of an ineffective assistance of counsel claim under *Strickland v. Washington*, 466 U.S. 668 (1984), the standard is "all the more difficult" because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (internal citations and quotation marks omitted). "[T]he question is not whether counsel's actions were reasonable"; but whether "there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Ibid.*

A violation of the Sixth Amendment right to effective assistance of counsel is established where an attorney's performance was deficient and the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. The defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by

12

the Sixth Amendment." *Id.* at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 688) (internal quotes omitted)).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Unless the petitioner demonstrates both deficient performance and prejudice, "it cannot be said that the conviction [or sentence] resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

Petitioner argues first that counsel was ineffective in the handling of the jury instructions. He argues that counsel should have objected to the claim of right jury instruction being given only with respect to the charge of assault with intent to commit armed robbery charge (of which he was acquitted) and that counsel should have requested that the instruction also be given with respect to the first-degree home invasion charge. The Michigan Court of Appeals held that this claim was based upon Petitioner's mischaracterization of the charges against him. *Hunt*, 2011 WL 923547 at *7. Petitioner argued for the claim of right instruction with respect to the charge of first-

13

degree home invasion with the underlying felony of *larceny*. However, Petitioner was charged with the underlying felony of assault, and, the Michigan Court of Appeals held, a claim of right instruction would not have been applicable to that charge. *Id.* Therefore, the state court held that "defense counsel was not ineffective for choosing not to request it or failing to object." *Id.*

It is outside the province of a federal court, on habeas review, to second-guess a state court's interpretation of state law. *Davis v. Morgan*, 89 F. App'x 932, 936 (6th Cir. 2003). Where a state appellate court has assessed the necessity and adequacy of a particular jury instruction under state law, a federal habeas court cannot question that state-law finding. *Id.* Given the deference owed the state court's decision that Petitioner's requested instruction was inappropriate, the state court's finding that counsel was not ineffective in failing to object to or request the instruction was a reasonable application of *Strickland*.

Second, Petitioner argues that counsel was ineffective for failing to inquire further into the potential bias of a juror or to exercise a peremptory strike to dismiss the juror. Petitioner argues that several areas of potential bias emerged during *voir dire*: the juror had a close friend in the Flint Police Department, was a captain of the Northville Fire Department, had two pending court cases involving automobile accidents in which his son was a victim, and had been the victim of two assaults, one involving a knife, the other a handgun.

The Michigan Court of Appeals observed that Petitioner failed to identify further questions counsel should have asked the juror and that the juror repeatedly confirmed his ability to be a fair and impartial juror. The juror stated that none of the experiences

which Petitioner now raises as evidence of potential bias would impede his ability to be fair. The Michigan Court of Appeals concluded that the decision to keep the juror was a matter of reasonable trial strategy. *Hunt*, 2011 WL 923547 at *8. Moreover, the state court noted that the jury ultimately acquitted Petitioner of many of the charged counts, which "undercut defendant's argument" because the allegedly biased juror "was obviously a participant in these acquittals." *Id.*

The exercise of peremptory challenges is a matter of trial strategy and there is no evidence in the record that counsel lacked strategic reasons for declining to exercise a peremptory challenge. In addition, where an ineffective assistance of counsel claim is founded on a claim that counsel failed to reasonably exercise peremptory challenges, a petitioner must show that a juror was actually biased against him. *See Hughes v. United States*, 258 F.3d 453, 458 (6th Cir. 2001). Petitioner has not met this burden. Accordingly, the Court finds that the state court reasonably applied *Strickland*.

### C. Scoring of Offense Variables

Finally, Petitioner challenges the trial court's scoring of offense variables 1, 2, 4, and 13. Respondent argues that this claim is untimely. The statute of limitations is not a jurisdictional bar to habeas review. *Smith v. State of Ohio Dep't of Rehab.*, 463 F.3d 426, 429 n.2 (6th Cir. 2006). A federal court may proceed to the merits of a habeas petition rather than resolve the question of timeliness in the interest of judicial economy. *Id.* Here, the court need not decide the issue of timeliness because Petitioner's claim fails for reasons other than the statute of limitations.

The Michigan Court of Appeals held that the offense variables were correctly scored because a sufficient factual basis supported the scoring. *Hunt*, 2011 WL 923547

at *8-9. "'[F]ederal habeas corpus relief does not lie for errors of state law.'" *Estelle v. McGuire,* 502 U.S. 62, 67, *quoting Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). Petitioner's argument that the state court erred in scoring his sentencing guidelines is based solely on the state court's interpretation of state law. It does not implicate any federal rights. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting on habeas review."); *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) ("[S]tate courts are the ultimate expositors of state law."). "[A] claim that the trial court mis-scored offense variables in determining the state sentencing guidelines is not cognizable on habeas corpus review." *See Adams v. Burt*, 471 F. Supp. 2d 835, 844 (E.D. Mich. 2007); *see also Coleman v. Curtin*, 425 F. App'x 483, 484-85 (6th Cir. 2011). Habeas corpus relief is not available for this claim.

## IV. CERTIFICATE OF APPEALABILITY

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability ("COA") is issued under 28 U.S.C. § 2253. A COA may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U .S.C. § 2253(c)(2). A petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000) (citation omitted). In this case, the court concludes that reasonable jurists would not debate the conclusion that the petition fails to state a claim upon which habeas corpus relief should be granted. Therefore, the court will deny a certificate of

appealability.

## V. CONCLUSION

Accordingly, IT IS ORDERED that the petition for a writ of habeas corpus is DENIED.

IT IS FURTHER ORDERED that the court DECLINES to issue a certificate of appealability.

                            S/Robert H. Cleland
                            ROBERT H. CLELAND
                            UNITED STATES DISTRICT JUDGE

Dated: October 29, 2015

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, October 29, 2015, by electronic and/or ordinary mail.

                            S/Lisa Wagner
                            Case Manager and Deputy Clerk
                            (313) 234-5522